## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| PATRICIA MITCHELL TRACEY<br>5924 FRANKFORD AVENUE<br>BALTIMORE, MD 21206<br><br>and<br><br>LARRY AUSTIN<br>5511 WILVAN AVENUE<br>BALTIMORE, MARYLAND 21207<br><br>*Individually and on behalf of a class of consumers similarly situated*,<br><br>      *Plaintiffs*,<br><br>vs.<br><br>UNITED GENERAL TITLE INS. CO.<br>999 18TH STREET STE 3400<br>DENVER, CO 80220<br>    SERVE ON:<br>    STATE DEPARTMENT OF<br>    ASSESSMENTS AND TAXATION<br>    301 W. PRESTON STREET<br>    BALTIMORE, MD 21201<br><br>and<br><br>FIRST AMERICAN TITLE INS. CO.<br>1 FIRST AMERICAN WAY<br>SANTA ANA, CA 92707<br>    SERVE ON:<br>    CSC-LAWYERS INCORPORATING<br>    SERVICE CO.<br>    7 ST. PAUL STREET, SUITE 1660<br>    BALTIMORE, MD 21202<br><br>    *Defendants*. | Case No. 1:12-cv-1329 |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Patricia Mitchell Tracey, and Larry Austin (hereinafter the "Named

Plaintiffs"), on their own behalf and on behalf of the class defined herein, by and through Counsel, hereby sue Defendants United General Title Insurance Co. ("United General") and First American Title Insurance Company ("First American") (collectively, "Defendants"), and state as follows:

## I.     INTRODUCTION

1.      This is a class action by homeowners seeking relief from the predatory practices of two title insurers, United General and First American (which acquired United General), that violated both their statutory and common law obligations.   In particular, the Defendants participated in a scheme to systematically cheat Maryland consumers who refinance their mortgages, by charging them premiums for title insurance that are far in excess of the rates permitted under Maryland law.

2.      As Title Insurers, Defendants United General and First American rely heavily on local title companies, as Insurance Producers, or agents to assist them in procuring title insurance policies.   As compensation for such services, United General and First American split the premiums paid for the title insurance between themselves and the Insurance Producer.

3.      Under the common law of Maryland and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), this action seeks to recover the excess and unearned premiums paid to United General and First American.   In particular, instead of charging and collecting a discounted premium filed with and approved by the Maryland Insurance Administration ("MIA") as the "reissue rate" for Maryland purchasers of title insurance who refinanced their mortgages within ten years of a previously issued title insurance policy, Defendants United General and First American, through their agents and/or employees, instead collected the much

higher premium – the "original issue rate" – from such class members.  Rather than provide the rates filed with the MIA, as required under Maryland law, the Defendants charged class members an amount of money they were not entitled to have or receive.  The excess premiums charged to and collected from Named Plaintiffs and the class members were then split with the local title company (i.e., the Insurance Producer) that procured the title policy on behalf of Defendants, as an additional referral fee or kickback.

4.      Plaintiffs are a class of Maryland consumers whose property had, within the previous 10-years, a validly issued title insurance policy – entitling them to a 40% discount off the premium for newly issued title insurance policies by United General and/or First American – but who did not receive any such discount.

## II.      JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (Federal Question) and 28 U.S.C. § 1367 (Supplemental Jurisdiction). Named class plaintiffs have fully exhausted all of their administrative remedies before the Maryland Insurance Administration.

6.      Venue is proper in this District because, under 28 U.S.C. § 1391(b), a substantial part of the events giving rise to claims herein occurred within this District and the conspirators all systematically and continually transact business in this District.

## III.     THE PARTIES

### A.      The Named Plaintiffs

7.      Plaintiff Patricia Mitchell Tracey is a resident of Baltimore City who resides at 5924 Frankford Avenue, Baltimore, Maryland 21206.

8.      Plaintiff Larry Austin is a resident of Baltimore County who resides at 5511 Wilvan Avenue, Gwynn Oak, Maryland  21207.

**B.      The Co-Conspirators**

9.      Conspirator United General is a Colorado corporation doing business in the State of Maryland as a title insurance underwriter, or a title "insurer . . . engaged as an indemnitor, surety or contractor in the business of entering into insurance contracts," as set forth in Md. Code Ann. Insurance § 1-101(v).

10.     United General was licensed to underwrite and issue title insurance policies for properties located in Maryland during the Class Period and also conducted business in other states as well.  United General was merged into First American when First American acquired United General's parent company, United General Financial Services, Inc., on or about February 18, 2005.  Pursuant to the terms of the acquisition, First American assumed all of the rights and liabilities of United General.

11.     Conspirator First American is a California corporation doing business in the State of Maryland as a title insurance underwriter, or a title "insurer . . . engaged as an indemnitor, surety or contractor in the business of entering into insurance contracts," as set forth in Md. Code Ann. Insurance § 1-101(v).

12.     First American is licensed to underwrite and issue title insurance policies for properties located in Maryland and also conducts business in other states, as well.

13.     Both United General and First American wrote and issued thousands of title policies each year.  First American continues to do so.

14.     Both United General and First American are wholly-owned subsidiaries of First

American Financial Corporation, formerly known as First American Corporation.

15.     At all times relevant to this Complaint, United General and First American operated in Maryland with the assistance of their title insurance agents, otherwise known as "Insurance Producers" which Maryland law defines as a "person that, for compensation, sells solicits, or negotiates insurance contracts . . .[for] persons issuing the insurance contracts." Md. Code Ann. Insurance § 1-101(u)(1).   United General and First American participated as co-conspirators with each other and various other persons, firms and entities in the offenses charged, and have performed acts and made statements in furtherance of the scheme with these unnamed Insurance Producers to collect excessive and unearned title insurance premiums at the expense of the consumer.

## IV.    FACTS APPLICABLE TO ALL COUNTS

16.     United General and First American are "engaged as indemnitor, surety, or contractor in the business of entering into insurance contracts," and as such, are each a title "insurer" under the Maryland Insurance Code. Md. Code Ann., Insurance 1-101(v).

17.     As Title Insurers, Defendants United General and First American rely heavily on local title companies, as Insurance Producers, or agents to assist them in procuring title insurance policies on behalf of owners and lenders.

18.     To compensate the Insurance Producers for securing the title insurance policy, and as a referral fee, United General and First American split the premiums paid for the title insurance between themselves and the Insurance Producers.

19.     United General and First American will pay the Insurance Producers, as compensation and as a referral fee, up to seventy-five percent (75%) or more of the premium

collected from the borrowers.

20.     The Maryland Insurance Code provides that a Title Insurer must file "all rates or premiums, supplementary rate information, forms of contracts, policies, or guarantees of insurance, and all modifications of contracts, policies, or guarantees of insurance that it proposes to use" with the Maryland Insurance Administration. Md. Code. Ann., Insurance § 11-403(a)(1) & (2).

21.     As Title "Insurers" selling title insurance in Maryland, the Defendants are obligated to "hold to the rates or premiums as approved by the Commissioner …" and may "…not deviate from the rates or premiums . . ." so approved. Md. Code Ann., Insurance § 11-407(b).  In addition, Title Insurers such as the Defendants, are prohibited from making or issuing any "contract, policy or guarantee of insurance except in accordance with filing approved as provided in this subtitle . . ." *Id*. at  § 11-407(a).

22.     Further, under the MIA's "Best Price Rule," the Defendant Title Insurers "must always place a consumer in the most favorably priced tier for which the consumer qualifies." *See* MIA's General Guidelines.

23.     Pursuant to the Maryland Insurance Code, Defendants United General and First American filed their title insurance rates with the Maryland Insurance Commissioner. Defendants' filed rates provide that whenever an application for new title insurance policy is made within 10 years of a previously issued title insurance policy on the same property, Defendants, including their agents or employees, are required to charge a "reissue rate" premium for such insurance.

24.     If a borrower applies for title insurance on property whose title had been insured

6

within 10 years, then the borrower must be given a 40% discount off of Defendants' published rates in force for original title insurance up to the face value of the previous policy.

25.     United General and First American rely heavily on the unnamed co-conspirators – the local title companies – as Insurance Producers, or agents to assist them in the issuance of title insurance policies.  As compensation for such services, Defendants split the premiums paid for the title insurance between themselves and the unnamed co-conspirators' title companies.

26.     United General and First American and the unnamed co-conspirators uniformly and consistently fail and/or refuse to honor the "reissue rate" for borrowers who are entitled to such a rate, and, accordingly have required borrowers, including but not limited to the Named Plaintiffs, to pay at least 40% more than the legally permitted rate for the reissued title insurance, to their loss and detriment.

## V.     FACTS APPLICABLE TO THE NAMED PLAINTIFFS

### A.     Patricia Mitchell Tracey

27.     Patricia Mitchell Tracey purchased her home located at 5924 Frankford Avenue in September 2004 for $152,170.

28.     In connection with her loan closing, Ms. Mitchell Tracey purchased an owner's title insurance policy covering the full value of her home.

29.     On or about March 1, 2005, Ms. Mitchell Tracey refinanced her home.  The closing and settlement services were provided by Custom Title & Escrow (i.e., a "Maryland Insurance Producer"), a Maryland company that is an agent of United General.

30.     The loan amount for Ms. Mitchell Tracey's March 2005 refinance was $101,500.

31.     In connection with the March 1, 2005 refinance, Custom Title & Escrow, by and

on behalf of its principal – Defendant United General – issued a Lender's title insurance policy with a face value of $101,500.

32.     Line 1108 of Ms. Mitchell Tracey's March 1, 2005 HUD-1 Settlement Statement indicates that United General charged and collected from Ms. Mitchell Tracey a premium of $319.26 for the Lender's title insurance policy.

33.     In connection with the March 1, 2005 refinance, however, Ms. Mitchell Tracey was entitled to a "Reissue Rate" premium of $153.00 (representing $1.50 per thousand (the reissue rate) for $102,000), which is a 40% discount off of the published rate in force for United General.

34.     In charging Ms. Mitchell Tracey an excessive and illegal premium for the Lender's title insurance policy, United General pocketed the difference of $166.26, and refused to credit any portion of it to Ms. Mitchell Tracey's account.

35.     As a title insurance company, United General, through its agent the Insurance Producer, conducted a title search of Ms. Mitchell Tracey's property and that of other class members and would have shown that the Named Plaintiff, and in fact, all class members, were refinancing mortgages that were all eligible for the discounted "reissue rate."

36.     On May 11, 2010, acting on the administrative complaint of Ms. Mitchell Tracey and Mr. Austin, the MIA determined that First American failed to charge Ms. Mitchell Tracey the proper, discounted rate for title insurance in violation of the Insurance Code and found that First American overcharged Ms. Mitchell Tracey for title insurance.

37.     The MIA declined to make any findings with respect to absent class members on whose behalf Ms. Mitchell Tracey also sought resolution.

8

38.     As a result of the MIA's findings and the absence of any further administrative proceedings, Ms. Mitchell Tracey has exhausted her administrative remedies prior to instituting this lawsuit.

**B.     Larry Austin**

39.     Larry Austin purchased his property at 5511 Wilvan Avenue, Gwynn Oak, MD 21207 on or about October 21, 1999 for $70,000.

40.     On June 19, 2007, Mr. Austin obtained a $140,000 loan on his property in connection with its refinancing in which First American issued a lender's title insurance policy with a face value of $140,000.

41.     On or about June 16, 2008, Mr.  Austin refinanced his home again.  The closing and settlement services were provided by Endeavor Title, LLC (i.e., an "Insurance Producer"), a Maryland company that is an agent of First American.

42.     The loan amount for Mr. Austin's June 16, 2008 refinance was $155,396.

43.     In connection with the June 16, 2008 refinance, Endeavor Title, by and on behalf of its principal – Defendant First American – issued a Lender's title insurance policy with a face value of $155,396.

44.     Line 1108 of Mr. Austin's June 16, 2008 HUD-1 Settlement Statement indicates that First American charged and collected from Mr. Austin a premium of $390.00 for the Lender's title insurance policy.

45.     In connection with the June 16, 2008 refinance, however, Mr. Austin was entitled to a "reissue rate" premium of $250.00 (representing $1.50 per thousand (the reissue rate) for the first $140,000 and $2.50 per thousand (the original issue rate) for the next $16,000).

46.     In charging Mr. Austin an excessive and illegal premium for the Lender's title insurance policy, First American pocketed the difference of $140.00 and refused to credit any portion of it to Mr. Austin's account.

47.     As a title insurance company, First American, through its agent the Insurance Producer, conducted a title search of Mr. Austin's property and that of other class members which revealed that Mr. Austin, and in fact, all class members, were refinancing mortgages that were all eligible for the discounted "reissue rate."

48.     On May 11, 2010, acting on the administrative complaint of Ms. Mitchell Tracey and Mr. Austin, the MIA determined that First American failed to charge Mr. Austin the proper, discounted rate for title insurance in violation of the Insurance Code and found that First American overcharged Mr. Austin for title insurance.

49.     The MIA declined to make any findings with respect to absent class members on whose behalf Mr. Austin also sought resolution.

50.     As a result of the MIA's findings and the absence of any further administrative proceedings, Mr. Austin has exhausted his administrative remedies prior to instituting this lawsuit.

## VI.     CLASS ACTION ALLEGATIONS

51.     Named Plaintiffs, having exhausted their administrative remedies, bring this action individually and as a class action pursuant to *Fed.R.Civ.P.* 23 on behalf of a class (the "Class") defined as follows:

> All persons or entities in Maryland who, within 10 years of having previously purchased title insurance in connection with their mortgage or fee interest, refinanced the identical mortgage or fee interest, and were charged a title insurance premium by United General and/or First American that exceeded the applicable premium discount or "reissue rate" for title insurance on file with the

10

Maryland Insurance Administration that such persons or entities should have been charged.  Excluded from the Class are officers and directors of the Defendants, as well as any personnel of the Court.

52.     The class as defined above is identifiable and was previously certified as a class action.  The Named Plaintiffs are members of the class.

53.     The class consists, to Plaintiffs' information and belief, of thousands of individuals, and is thus so numerous that joinder of all members is clearly impracticable.

54.     There are questions of law and facts which are not only common to the class, but which predominate over any questions affecting only individual class members.   The predominating questions include, but are not limited to:

a.     Whether the Defendants and their agents systematically collected premiums from Class Members in amounts not permitted under the Maryland Insurance Code.

b.     Whether the Defendants and their agents intentionally and/or negligently omitted to disclose material facts to the Named Plaintiffs and the Class that they need only pay the discounted premiums for the reissuance of title insurance on the refinancing of their mortgages or fee interests.

c.     Whether the Defendants and their agents owed the Named Plaintiff and the Class a duty of care to obtain information and documents necessary to determine the best rate for which the Named Plaintiffs and the Class were entitled to receive under the Maryland Best Price Rule.

d.     Whether the Defendants and their agents breached an implied in fact contract with the Named Plaintiffs and the Class.

  e.  Whether the Defendants and their agents were unjustly enriched by their improper conduct.

  f.  Whether the Defendants and their agents should be enjoined from further engaging in such improper conduct.

  g.  Whether the Defendants and their agents were part of a conspiracy that harmed the class.

  h.  Whether Named Plaintiffs and members of the class have sustained damages and the proper measure of such damages.

  i.  Whether the Defendants and their agents paid and/or received illegal referral and unearned fees of the title insurance issued to the Class.

  j.  Whether the Defendants' scheme to overcharge Named Plaintiffs and the Class was a fraud scheme.

  k.  Whether the Defendants used the US Mails in furtherance of the fraud scheme.

  l.  Whether the Racketeer Influenced Corrupt Organizations statute, 18 U.S.C. § 1961, *et seq*. ("RICO") applies to the Defendants' activities.

  m.  Whether the Defendants were part of a conspiracy to defraud the class.

  n.  Whether the Defendants were involved in any racketeering activity.

  o.  Whether Defendants participated in the operations of a racketeering enterprise.

p.      Whether the racketeering acts were conducted as part of a pattern.

q.      Whether the racketeering enterprise affected interstate commerce.

r.      Whether Defendants utilized an Association-in-Fact as a racketeering enterprise.

s.      Whether the commission by co-conspirators of numerous acts of mail fraud was in furtherance of their scheme to defraud.

t.      Whether Defendants sent or directed the sending of documents through the United States Postal Services in furtherance of the scheme to defraud.

u.      Whether Defendants directly or indirectly invested in, maintained an interest in, or participated in the conduct or management of an enterprise.

v.      Whether Defendants transported money interstate converted or fraudulently obtained.

55.     The claims of the Named Plaintiffs are typical of the claims of each member of the class, within the meaning of *Fed.R.Civ.P.* 23(a)(3), and are based on and arise out of identical facts constituting the wrongful conduct of Defendant.

56.     Plaintiffs will fairly and adequately protect the interest of the Class.  Named Plaintiffs and the Class have retained counsel experienced and competent in class actions and complex consumer litigation.

57.     Named Plaintiffs have no conflicts of interest with the class.

58.     The prosecution of the separate actions by individual members of the class would create a risk of establishing incompatible standards of conduct for Defendants, within the meaning of *Fed.R.Civ.P.* 23 (b)(1)(A).

59.     Defendants' actions are generally applicable to the class as a whole, and Plaintiffs seek equitable remedies with respect to the class as a whole within the meaning of *Fed.R.Civ.P.* 23(b)(2).

60.     Common questions of law and fact enumerated above predominate over questions affecting only individual members of the class, and given the refusal of the MIA to entertain any class allegations in an administrative proceeding, a class action is the superior method for fair and efficient adjudication of the controversy, within the meaning of *Fed.R.Civ.P.* 23 (b)(3).  The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.  To Plaintiffs' knowledge, no other similar litigation against United General and First American is currently pending by other members of the class.

61.     There are no unusual difficulties in the management of this case as a class action. In fact, prior to exhausting her administrative remedies, Ms. Mitchell Tracey's previous class complaint was, in fact, certified as a class action.

## VII.   CIVIL RICO SUMMARY

62.     In connection with the activities giving rise to this action, the Defendants acted with malice, intent and knowledge, and with a wanton disregard for the rights of Plaintiffs and other consumers.

63.     At all relevant times herein, the "enterprise" described herein, was engaged in interstate commerce in that *inter alia*, the title insurance policies which are the subject of the scheme to defraud set forth in this Class Action Complaint, were underwritten and issued in Maryland and were serviced by out-of-state Defendants United General and First American.

64.     The "enterprises" described herein were associations-in-fact between United General and its title agents in Maryland, and First American and its title agents in Maryland. The settlement agents of Plaintiffs and the Class worked with and assisted Defendants in misrepresenting the amount due and owing for title insurance and misappropriating the overcharges.

65.     The enterprises are separate and distinct from each of the Defendants and from each of the other members of their respective enterprises.   The enterprises are ongoing organizations and exist to advance the interests of the individual entities that comprise their memberships.   The enterprises engage in the legitimate marketing of title insurance policies, performing title searches, and investigating and paying claims.   Their activities are directed by united General and First American and include the use of systems and procedures for conducting title searches, for collecting and processing payments for title searches and title insurance policies, for issuing policies, and for providing title insurance for lenders and owners, and the relationship between Defendants and their respective title agents are governed by agency agreements.   Defendants and their respective agents function as a continuing unit.   Each member fo the enterprises performs a role in the group consistent with their organizational structures, which further the activities of the enterprises to market and sell title insurance.

66.     Defendants are the principals in their respective enterprises and have the responsibility for providing title insurance policies.   Defendants have agent selection processes to select agents to issue united General and First American policies.   The title agents act as United General's and First American's agents in selling title insurance policies and often act as closing agents for the lenders in the same mortgage transactions.   The title agents, acting on

Defendants' behalf and subject to Defendants' direction and control, are responsible for conducting the title searches and (with Defendants' assistance) calculating the title insurance premiums.  The title agents take a percentage of the premiums collected as their remuneration for their services.  The title agents are not employees of Defendants, but rather are non-exclusive agents who work with different title insurance companies – and although they have agency agreements with Defendants, they are separate, independent entities which do not function as subsidiaries or employees of Defendants.  The title agents act in furtherance of the fraudulent scheme to overcharge insurance customers, acting simultaneously as title agents and closing agents.  Defendants directed the activities of the title agents in the ocurse of the enterprise, and authorized them to issue title insurance policies on Defendants' behalf.

67.     The purpose of the enterprise created by the Defendants was to guarantee a stream of business for themselves and in return transfer illegal payments and kickbacks to the unnamed title Insurance Producers to reward the unnamed title Insurance Producers for the guaranteed stream of business.  In order to create the payments and kickbacks the unnamed title Insurance Producers and Defendants overcharged borrowers for title insurance.

68.     In order to further this fraud scheme, the co-conspirators used the United States mails and telephone wires interstate which constituted the offense of mail fraud and wire fraud as proscribed and prohibited by 18 U.S.C. §§ 1341 and 1343 and multiple instances of interstate transport of money converted or fraudulently obtained in violation of 18 U.S.C. § 2314. Defendants and their co-conspirators on numerous occasions used and caused to be used mail depositories of the United States Postal Service by both placing and causing to be placed mailable matters in said depositories and by removing and causing to be removed mailable

matter from said depositories.

69.     For example, during the relevant class period, Defendants used the United States mails and telephone wires to submit annual reports to Maryland Insurance Administration ("MIA") in an effort to demonstrate to the MIA that Defendants' premiums collected from consumers complied with Maryland law.  Unless Defendants made such a representation to the MIA through the annual reports, Defendants could not continue to issue title insurance to consumers in Maryland.  Relying on the legitimacy of the enterprise and the documentation submitted by Defendants, the MIA permitted Defendants to continue conducting business in this state.

70.     Moreover, in connection with the preparation of the insurance binder for Ms. Mitchell Tracey's refinancing, Custom Title & Escrow transmitted by wire and/or the US mail, Ms. Mitchell Tracey's title insurance commitment; such transmission was a pre-condition for United General and Custom Title & Escrow to collect a title insurance premium from Ms. Mitchell Tracey.

71.     Also, in connection with the settlement of Mitchell Tracey's refinancing, Custom Title & Escrow transmitted by wire and/or the US mail, the lender's title insurance policy for Mitchell Tracey that was issued in furtherance  of the scheme set forth herein.

72.     Similarly, in connection with the preparation of the insurance for Mr. Austin's refinancing, Endeavor Title transmitted by wire and/or the US mail Mr. Austin's title insurance commitment; such transmission was a pre-condition for First American and Endeavor Title to collect a title insurance premium from Mr. Austin.

73.     Moreover, in connection with the settlement of Mr. Austin's refinancing,

Endeavor Title transmitted by wire and/or the US mail, the lender's title insurance policy for Mr. Austin that was issued in furtherance of the scheme set forth herein.

74.     At all relevant times herein, in connection with the activities giving rise to this action, the Defendants and their co-conspirators conspired with each other to engage in the various activities set forth herein, agreed to participate in the operation of the conspiracy and scheme to defraud Named Plaintiffs and other consumers, and aided and abetted one another in these activities, all as proscribed by federal law.

75.     As set forth herein, during the relevant times, and in furtherance of and for the purpose of executing the scheme and artifice to defraud, the Defendants on numerous occasions used and caused to be used, mail depositories of the United States Postal Service by both placing and causing to be placed mailable matters in said depositories and by removing and causing to be removed mailable matter from said depositories, including, but not limited to HUD-1 Settlement Statements, correspondence, other loan closing documents, original owner's title insurance policies and lender's title insurance policies.

76.     Specifically, once a month, and on other periodic bases, and continuing through the date of this Class Action Complaint, the unnamed title Insurance Producers would tally up their illegal profits and distribute the gains between themselves and the Defendants through either the US Mails or by wire transfer.  Upon information and belief, the distributions, if sent by mail, were always sent from a location in Maryland through the US Mails to United General in Colorado and to First American in California.

77.     Moreover, documents in Ms. Mitchell Tracey's transaction were sent through the United States mails on February 22, 2005 to the lender in Ms. Mitchell Tracey's transaction.

These mailers included a piece of correspondence from the enterprise's co-conspirators and the lender's title insurance policy issued by United General and countersigned by Custom Title & Escrow.  Ms. Mitchell Tracey paid the title insurance premium for such lender's policy even though the policy was solely for the benefit of the lender.  This mailer attempted to and was successful in deceptively hiding the fact that United General and Custom Title & Escrow had overcharged Ms. Mitchell Tracey.

78.     Moreover, documents in Mr. Austin's transaction were sent via interstate wires and through the United States mails on June 16, 2008 to the lender in Mr. Austin's transaction. These mailers included a piece of correspondence from the enterprise's co-conspirators and the lender's title insurance policy issued by First American and countersigned by Endeavor Title, LLC.  Mr. Austin paid the title insurance premiums for such lender's policy even though the policy was solely for the benefit of the lender.  This mailer attempted to and was successful in deceptively hiding the fact that First American and Endeavor Title, LLC had overcharged Mr. Austin.

79.     These mailers, which included a piece of correspondence and either an owner's or lender's title insurance policy, were not limited to the Named Plaintiffs, but rather, were also sent through the United States mails to each member of the Class completing a transaction where one of the unnamed Title Insurance Producers charged and collected a fee from a consumer.  The co-conspirators repeated this pattern – that is, the use of the United States mails in furtherance of the scheme – in thousands of similar real estate transactions.  Each such use of the United States mails in connection with the scheme and artifice to defraud constituted the offense of mail fraud as proscribed and prohibited by 18 U.S.C. § 1341.

80.     The enterprises functioned as continuing units with common purposes of deliberately overstating the amounts due and owing for title insurance, and Defendants have knowledge of the overcharging and acted with the intent to defraud.  The enterprise which operated continuously since at least 2001 and affected thousands of borrowers' transactions – used form documents that were sent through the US Mails and constituted a pattern of racketeering activity.

81.     If Plaintiffs and class members had then suspected that Defendants and the Title Insurance Producers were overcharging them on their title insurance premiums, and further that the overcharge was in furtherance of a scheme to launder the payment of illegal fees and kickbacks, at their expense, they would have refused to conduct business with Defendants, or at a minimum, would not have paid overcharges, and would have sought to secure their rights under the law at that time.

82.     Plaintiff and Class members' injuries to their property were caused by Defendants' initial contribution from illicit income to create the enterprise that was derived from previous racketeering activity in that the enterprise would not have been in operation had it not been for the Defendants' other and previous racketeering activities.

**FIRST CAUSE OF ACTION**
**Money Had and Received**

83.     Plaintiffs incorporate and reallege each of the foregoing paragraphs as if fully set forth herein.

84.     As set forth above, and actually determined by the MIA, the Defendants assessed and collected premiums for title insurance in amounts exceeding the rates that Defendants had filed with the Maryland Insurance Administration.

20

85.     The  Defendants have come into the possession of money in the form of premium payments for title insurance that they had, and have no right to at law or in equity.

86.     It would be inequitable for Defendants to retain any such monies that they had no legal right to charge.

87.     As a consequence, Named Plaintiffs and the members of the Class have been damaged.

WHEREFORE, Plaintiffs and the class pray that:

I.      The Court determine, as provided by *Fed.R.Civ.P.* 23, that this action proceed as a class action;

II.     Plaintiffs and other members of the Class recover damages determined to have been sustained by each of them and that judgment be entered against the Defendants for the amount determined, including pre-judgment interest;

III.    Plaintiffs and the members of the Class they represent recover the costs and expenses of this suit, including reasonable attorneys' fees;

IV.     The Court grant such other and further relief as the case may require, including equitable and/or injunctive relief.

## SECOND CAUSE OF ACTION
### Negligence

88.     Plaintiffs incorporate and re-allege each of the foregoing allegations as if fully set forth herein:

89.     Defendants, their agents and/or employees, negligently failed to obtain the information and documents that would have revealed that each and every one of them was entitled to the discounted title insurance rate, as alleged herein.

90.     As a direct and proximate result of Defendants' negligence, Named Plaintiffs, as determined by the MIA,  and the Class purchased and/or paid for title insurance at rates that were in excess the rates provided for under the law of Maryland in violation of Md. Ins. Code § 27-216(b)(1).

91.     Defendants, including their agents or employees, owed a duty of care to the Named Plaintiffs and the Class, including the duty not to collect a premium or charge for insurance that exceeds the premium or charge to which the Named Plaintiffs and the Class were entitled to receive under the Maryland Best Price Rule and Md. Ins. Code § 27-216(b)(1).

92.     Defendants negligently breached the duty of care it owed to Named Plaintiffs and the Class by failing to obtain the information and documents that would have revealed that each and every one of them was entitled to the discounted title insurance rate, as set forth herein.

93.     As a result of the negligence of Defendants, its agents and/or employees, Named Plaintiffs and the Class have been damaged.

WHEREFORE, Plaintiff and the Class pray that:

I.     The Court award Plaintiffs and the Class compensatory damages in an amount to be determined by the jury;

II.     The Court award Plaintiffs and the Class reasonable costs and attorneys' fees; and,

III.     The Court award Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

### THIRD CAUSE OF ACTION
### Breach of Contract

94.     Plaintiffs incorporate and re-allege each of the foregoing allegations as if fully set

forth herein

95.     Defendants entered into a contract with each of the Plaintiffs and with Class members including offer, acceptance, and consideration (hereinafter called the "Contract").

96.     Pursuant to the Contract, Plaintiffs and Class members paid money to Defendants in exchange for its providing a lender's policy of title insurance to Plaintiffs' and Class Members' lenders, so that they could obtain mortgage refinancing. Defendants received premiums in exchange for the issuance of a policy of title insurance.  By statute, the Contract includes, without limitation, Defendants' obligation to charge a premium in accordance with its filed and approved Maryland rates, including, but not limited to the Defendants' obligation under Md. Code Ins. § 27-216 (b)(1) to not willfully collect a premium for insurance that is less than the premium or charge applicable to title insurance under rates as filed and approved by the Insurance Commissioner.

97.     By operation of law, if the Contract contains any term that violates the applicable provisions of the Insurance Code, that term will be deemed invalid and the Contract will be construed in a manner that meets the requirements of the Code. Thus by operation of law, the Contract includes Defendants' discounted refinance rate.

98.     Implied in the contract is also Defendants' obligation to comply with the requirements of the Insurance Code, and to operate in good faith.

99.     Plaintiffs and Class members performed their obligations under the Contract by paying the premiums charged by Defendants through its agents.

100.    Defendants breached the Contract by, without limitation, (a) charging Plaintiffs and Class members more than the contract, as it must be construed, allows by failing to charge

them the discounted refinance rate in accordance with Defendants' filed and approved rates; and (b) failing to inform Plaintiffs and Class members that they qualified for such discounted rates.

101.    As a direct and proximate result of Defendants' breach of contract, Plaintiffs and Class members have suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiff and the Class pray that:

I.    The Court award Plaintiffs and the Class compensatory damages in an amount to be determined by the jury;

II.    The Court award Plaintiffs and the Class reasonable costs and attorneys' fees; and,

The Court award Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

## FOURTH CAUSE OF ACTION
## VIOLATION OF 18 U.S.C. 1962(a) ("RICO")

109.    Plaintiffs incorporate and re-allege each of the foregoing allegations as if fully set forth herein.

110.    Each Plaintiff and each class member is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

111.    Each Defendant and conspirator is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(a).

112.    Through the agreements between Defendants and each of the unnamed Title Insurance Producers and through the contractual arrangement and joint management activity between the co-conspirators, Defendants formed an association-in-fact with the other conspirators which constitutes an "enterprise" engaged in illegal activities affecting interstate

24

commerce pursuant to 18 U.S.C. §§ 1961(4) and 1962(a).

113.    Each of the conspirators were associated with this "enterprise" and did use or invest income derived from a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5) to operate, maintain control of, and maintain an interest in the enterprise.

114.    These unlawful activities included multiple instances of mail fraud, including but not limited to using and causing others to use, mail depositories of the United States Postal Service by both placing and causing to be placed mailable matters in said depositories and by removing and causing to be removed mailable matter from said depositories.  Documents sent through the United States Postal Services mails include correspondence along with either an owner or lender's title insurance policy in violation of 18 U.S.C. § 1341, which occurred uniformly and consistently prior to the existence of the "enterprise."

115.    The purpose of the Defendants' and co-conspirators' association-in-fact was to charge borrowers excessive fees with respect to title insurance and to give effect to the scheme described above.  This association-in-fact by Defendants and conspirators enabled them to disregard evidence that the Named Plaintiffs and class were entitled to discounted rates for title insurance, thus defrauding the public by requiring them to pay title insurance premiums that exceeded the premium permitted by the filed rate.

116.    The association-in-fact had a common or shared purpose; that is, to charge borrowers inflated and illegal fees, to defraud members of the public and to give effect to the scheme described above, and it had a distinct division of labor.  It continued as a unit, with a core membership, over a substantial period of time, exceeding five years, and was an ongoing organization established for an economic motive.  The association-in-fact remained viable and

active at the time this action was filed.

117.   Defendants and the unnamed title Insurance Producers each played a substantial and distinct role in the scheme.

118.   In this association-in-fact, the title Insurance Producers made the initial contact with the consumer.  The title Insurance Producers falsely and intentionally misrepresented to their customers that they would pay only the filed or best rate for title insurance.

119.   The title Insurance Producers then selected Defendants as the underwriter knowing, or having reason to know, that Defendants would make little if any effort to enforce the discounted reissue rate, thus maximizing the charge imposed upon the consumer.

120.   Defendants also actively participated in the scheme to defraud by accepting payment of the fees passed through the unnamed title Insurance Producers, supplying form documents and other assistance along the way.

121.   Defendants also actively participated in the scheme to defraud by negotiating the terms of its various agreement(s) with its co-conspirators. The improper use of these agreements resulted in the conspirators requiring borrowers to unwittingly pay excessive and illegal fees in respect of mortgage loan transactions.

122.   Defendants utilized this scheme to generate a large and steady stream of referrals from the unnamed title Insurance Producers.

123.   To further the scheme, co-conspirators used the United States Postal Service in each class member transaction to mail a piece of correspondence enclosed with a title insurance policy.  In each transaction the title insurance policy was sent through the US Mails to the lender as well as to Defendants.

124.    In addition to turning a blind eye to all of the evidence that entitled the Named Plaintiffs and the class to the discounted title insurance premium, the unnamed title Insurance Producers' role in this scheme was to transfer the funds paid by the borrowers for the title insurance commitments and policies.  Although each HUD-1 Settlement Statement represented that the title insurance producer was paid ostensibly valid fees, for such services, the fees payable to the title Insurance Producers, as reflected on each HUD-1 Settlement Statements, were in fact (and unknown to the borrower) paid to and split between Defendants and the title Insurance Producers.

125.    All of these activities of the association-in-fact form a pattern, continuous in nature, which consists of numerous unlawful individual acts directed to the Named Plaintiffs and to each class member.  The illegal activities of Defendants and other conspirators persisted over an extended period of time between at least 2001 and continuing until the present day.  Each mailed correspondence, which also included either a lender's or owner's title insurance policy, was sent out in furtherance of the conspiracy for which the Defendants are liable.

126.    These activities of the co-conspirators entailed multiple instances of mail fraud consisting of intentional mail fraud intended to induce, and inducing, Plaintiffs and the class to part with property and/or to surrender legal rights in violation of 18 U.S.C. § 1341.

127.    Through the use of this illegal and fraudulent scheme, and through its efforts to operate and maintain the enterprise described herein, to maintain the conspiracy and to facilitate overcharges for title insurance, the Defendants and other conspirators have been able to retain money which is rightfully payable to Plaintiffs and Class members, and to collect money not properly due from the Named Plaintiffs or Class members.

128.    The co-conspirators retained these illegally gained funds and reinvested and used those funds in their operations in violation of 18 U.S.C. § 1962(a).

129.    Plaintiffs and all class members have been injured in their property by reason of the operation of the enterprise in this unlawful manner and by investment of illicit proceeds from previous racketeering activities in the enterprise.

WHEREFORE, Plaintiffs and the Class pray that:

I.      The Court award Plaintiffs and the Class damages suffered as a result of the illegal acts set forth herein including compensatory damages in an amount equal to the overcharges for title insurance;

II.     The Court award Plaintiffs and the Class treble damages;

III.    The Court award Plaintiffs and the Class reasonable costs and attorneys' fees; and,

IV.     The Court award Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

## FIFTH CAUSE OF ACTION
## VIOLATION OF 18 U.S.C. § 1962(c) (RICO)

130.    Plaintiffs incorporate and re-allege each of the foregoing allegations as if fully set forth herein.

131.    Each Plaintiff and each Class member is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

132.    The co-conspirators are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

133.    The association-in-fact described in the Fourth Cause of Action above was an

"enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in, and the activities of which affect, interstate commerce.

134.    Defendants were each associated with the enterprise and participated in its management and operation by directing its affairs and by conducting business with each other and assisting in the scheme to charge borrowers excessive and illegal fees in connection with their issuance of title insurance policies. The Defendants each participated, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of unlawful activity under 18 U.S.C. § 1961(i)(b), 1961(5) and 1962(c), to wit

(a)    Multiple acts of mail fraud, in violation of 18 U.S.C. § 1341;

(b)    Multiple instances of wire fraud in violation of 18 U.S.C. § 1343; and

(c)    Multiple instances of interstate transport of money converted or fraudulently obtained in violation of 18 U.S.C. § 2314.

135.    Each Class member suffered injury to their property, within the meaning of 18 U.S.C. § 1964(c), by reason of the violation of 18 U.S.C. § 1962(c).

WHEREFORE, Plaintiffs and the Class pray that:

I.    The Court award Plaintiffs and the Class damages suffered as a result of the illegal acts set forth herein including compensatory damages in an amount equal to the overcharges for title insurance;

II.    The Court award Plaintiffs and the Class treble damages;

III.    The Court award Plaintiffs and the Class reasonable costs and attorneys' fees; and,

IV.    The Court award Plaintiffs and the Class such other and further relief as the Court

may deem just and proper.

## SIXTH CAUSE OF ACTION
## VIOLATION OF 18 U.S.C. § 1962(d) (RICO)

136.   Plaintiffs incorporate and re-allege each of the foregoing allegations as if fully set forth herein.

137.   Plaintiffs and each Class member are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

138.   The co-conspirators are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

139.   The association-in-fact described in the Fourth and Fifth Causes of Action above was an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which enterprise was engaged in, and the activities of which affect, interstate commerce.

140.   The Defendants as co-conspirators were associated with the enterprise described herein, and conspired within the meaning of 18 U.S.C. § 1962(d) to violate § 1962(a) and (c).

141.   The Defendants as co-conspirators conspired to use or invest income derived from a pattern of unlawful activity under 18 U.S.C. § 1961(1) to acquire an interest in, establish and operate the enterprise and have done so through a pattern of unlawful activity including under 18 U.S.C. § 1961(1), *inter alia*, multiple instances of mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343 and interstate transport of money converted or fraudulently obtained in violation of 18 U.S.C. § 2314.

142.   The Defendants as co-conspirators conspired to operate, maintain control of, and maintain an interest in the enterprise and have done so through a pattern of unlawful activity including under 18 U.S.C. § 1961(1), *inter alia*, multiple instances of mail fraud in violation of

18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343 and interstate transport of money converted or fraudulently obtained in violation of 18 U.S.C. § 2314.

143.    The Named Plaintiffs and each Class member have suffered injury to his property within the meaning of 18 U.S.C. § 1964(c) by reason of the commission of overt acts constituting illegal activity in violation of 18 U.S.C. §§ 1961(1) and 1962(d).

WHEREFORE, Plaintiffs and the Class pray that:

I.    The Court award Plaintiffs and the Class damages suffered as a result of the illegal acts set forth herein including compensatory damages in an amount equal to the overcharges for title insurance;

II.    The Court award Plaintiffs and the Class treble damages;

III.    The Court award Plaintiffs and the Class reasonable costs and attorneys' fees; and,

IV.    The Court award Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL

Plaintiffs demand a trial by jury of all issues so triable.

/s/Martin E. Wolf
Martin E. Wolf, (Bar No. 09425)
Benjamin H. Carney, (Bar No. 27984)
GORDON & WOLF, CHTD.
102 West Pennsylvania Ave., Ste. 402
Baltimore, Maryland  21204
(410) 825-2300

Philip Friedman, (Bar No. 22766)
FRIEDMAN LAW OFFICES, PLLC.
2401 Pennsylvania Ave., N.W., Suite 410
Washington, DC 20037
(202) 293-4175

Attorneys for Plaintiffs