IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|  |  |
|---|---|
| PATRICIA MITCHELL TRACEY, *et al.*, | * |
| Plaintiffs, | * |
|  | * |
| v. | * |
|  | * |
| FIRST AMERICAN TITLE INS. CO. | * |
|  | * |
| Defendant. | * |

CIVIL NO.: WDQ-12-1329

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

Patricia Mitchell Tracey and Larry Austin (collectively, the "Plaintiffs"), on behalf of themselves and others similarly situated, sued First American Title Ins. Co. ("First American")[1] for violating the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962, and other claims.  For the following reasons, First American's motion to dismiss will be denied.

---

[1] The Plaintiffs also sued United General Title Ins. Co. ("United General"), which is no longer a party.  ECF Nos. 5, 27; *see infra* note 3.

I.  Background[2]

A. Factual Background

This case arises out of title insurers United General and First American's alleged scheme to systematically "cheat" Maryland homeowners by charging premiums for title insurance in excess of the rates permitted by Maryland law.  Compl. ¶ 1.[3] Specifically, instead of charging and collecting a 40% discounted premium--filed with and approved by the Maryland Insurance Administration (the "MIA")[4]--for purchasers of title insurance who refinanced their mortgages within 10 years of a previously issued title insurance policy (the "reissue rate"), First American collected the higher basic rate.  *Id.* ¶¶ 3, 23-

---

[2] On a motion to dismiss, the well-pled allegations in the complaint are accepted as true.  *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011).  The Court will consider the pleadings, matters of public record, and documents attached to the motions that are integral to the complaint and whose authenticity is not disputed.  *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[3] On February 18, 2005, United General was merged into First American when First American acquired United General's parent company, United General Financial Services, Inc.  Compl. ¶ 10; *see also* ECF No. 5 at 1.  In connection with the merger, First American "assumed all of the rights and liabilities of United General."  ECF No. 5 at 1.

[4] Under the Maryland Insurance Code, a title insurer must (1) "file with the Commissioner all rates or premiums . . . that it proposes to use"; and (2) "hold to the rates or premiums as approved by the Commissioner."  Md. Code Ann., Ins. §§ 11-403(a), 11-407(b); *see also* § 27-216(b)(1) ("A person may not willfully collect a premium or charge for insurance that: (i) exceeds . . . [the] rates as filed with and approved by the Commissioner . . . ").

24.   First American split the excess premiums with the local

title company (the "insurance producers," or "agents") that had

procured the policies on its behalf.   *Id.* ¶¶ 2-3, 17-18, 25.

    1. Mitchell Tracey

    In September 2004, Mitchell Tracey purchased her home for

$152,170.00.  Compl. ¶ 27.   In connection with her loan closing,

she purchased an owner's title insurance policy.   *Id.* ¶ 28.   On

March 1, 2005, Mitchell Tracey refinanced her home.   *Id.* ¶ 29.

The closing and settlement services were provided by Custom

Title & Escrow ("Custom Title"), an agent of United General.

*Id.* ¶ 29.   The loan amount for the March 2005 refinance was

$101,500.00.   *Id.* ¶ 30.   In connection with the March 1, 2005

refinance, and acting on behalf of United General, Custom Title

issued a lender's title insurance policy with a face value of

$101,500.00.   *Id.* ¶ 31.   United General charged and collected a

premium of $319.26 for the policy.   *Id.* ¶ 32.   According to the

Plaintiffs, Mitchell Tracey was eligible for the discounted

reissue rate of $153.00[5]--a fact that would have been revealed

---

[5] $153.00 represents $1.50 per thousand for $102,000.00, a 40%
discount off the published rate in force for United General.
Compl. ¶ 33.   United General's rate filings provided that,
     When the owner of property on which application is
     made for mortgage title insurance has had the title to
     the property insured as owner within ten (10) years
     prior  to  such  application,  such  owner  shall  be
     entitled  to  the  following  reissue  rates  on  such
     mortgage  insurance  up  to  the  face  amount  of  such
     owner's policy, provided this company is provided with

through a title search of Mitchell Tracey's property. *Id.* ¶¶ 33, 35. Instead, United General "pocketed" the difference of $166.26, and "refused to credit any portion of it" to Mitchell Tracey's account. *Id.* ¶ 34.

### 2. Austin

In October 1999, Austin purchased his home for $70,000.00 Compl. ¶ 39. On June 19, 2007, Austin obtained a $140,000.00 loan on the property in connection with its refinancing. *Id.* ¶ 40. First American issued Austin a lender's title insurance policy with a face value of $140,000.00. *Id.* On June 16, 2008, Austin refinanced his home again. *Id.* ¶ 41. The closing and settlement services were provided by Endeavor Title, LLC ("Endeavor"), an agent of First American. *Id.* The loan amount for the June 2008 refinance was $155,396.00. *Id.* ¶ 42. In connection with the June 2008 refinance, and acting on behalf of First American, Endeavor issued a lender's title insurance policy with a face value of $155,396.00. *Id.* ¶ 43. First American charged and collected a premium of $390.00 for the policy. *Id.* ¶ 44. According to the Plaintiffs, Austin was

a copy of the owner's policy issued by this Company or by another company licensed to do business in Maryland. *The reissue rate shall be 60% of the Original Rate for First and Second Mortgage*[.]
ECF No. 3-3 at 3 (emphasis added).

entitled to the discounted reissue rate of $250.00[6]--a fact that would have been revealed through a title search of his property. *Id.* ¶¶ 45, 47.  Instead, First American retained the difference of $140.00, and refused to credit Austin's account.  *Id.* ¶ 46.

B. Procedural History

1. *Mitchell Tracey I*

On April 14, 2005, Mitchell Tracey filed a class action complaint in the Circuit Court for Baltimore County alleging violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2607, money had and received, negligent misrepresentation, and civil conspiracy.  No. WDQ-05-1428, ECF No. 2.  The Defendants removed the action to this Court.  No. WDQ-05-1428, ECF No. 1.  On July 19, 2005, Mitchell Tracey amended her complaint to add Milton Brown, Francine Byrd-Brown, and Helen Klatsky as named plaintiffs.  No. WDQ-05-1428, ECF No. 41.  On September 25, 2006, then-U.S. District Judge Andre M. Davis granted summary judgment for the defendants on the RESPA claim.  No. WDQ-05-1428, ECF No. 91.  The next day, Judge Davis granted class certification for:

> All persons or entities in Maryland who within 10 years of having previously purchased title insurance in connection with their mortgage or fee interest, refinanced the identical mortgage or fee interest, and were charged a title insurance premium by [one of the Defendants] that exceeded the applicable premium

---

[6] $250.00 represents $1.50 per thousand for the first $140,000.00 and $2.50 per thousand for the next $16,000.00.  Compl. ¶ 45.

> discount or "reissue rate" for title insurance on file
> with the Maryland Insurance Administration that such
> persons are entities should have been charged.

No. WDQ-05-1428, ECF No. 93.

On October 28, 2009, the Plaintiffs moved to file a second amended complaint to add claims for negligence, breach of contract, and violation of RICO.  No. WDQ-05-1428, ECF No. 138. On February 26, 2010, the Court denied the motion as futile, holding that because the proposed claims were dependent on the Maryland Insurance Code, and the Plaintiffs had not exhausted administrative remedies, *Arthur v. Ticor Title Insurance Company*, 569 F.3d 154 (4th Cir. 2009), decided July 18, 2009, would require their dismissal.[7]  No. WDQ-05-1428, ECF Nos. 141, 142.

---

[7] *Arthur* was a nearly identical case brought by the plaintiffs' counsel, in which the plaintiffs also alleged that a title insurer had charged them higher rates than it had filed with the MIA.  The Fourth Circuit affirmed the district court's Rule 12(b)(6) dismissal of the *Arthur* plaintiffs' claims for failure to exhaust administrative remedies under the Maryland Insurance Code.  The court explained:

> [u]nder Maryland law, when the statutory text creating
> an administrative remedy is not dispositive [about
> whether exhaustion is required], there is "a presumpt-
> ion that the administrative remedy is intended to be
> primary, and that a claimant cannot maintain the
> alternative judicial action without first invoking and
> exhausting the administrative remedy."

*Arthur v. Ticor Title Ins. Co.*, 569 F.3d 154, 161 (4th Cir. 2009) (*quoting Zappone v. Liberty Life Ins. Co.*, 349 Md. 45, 706 A.2d 1060, 1069 (1998)).  "Moreover, whe[n] a judicial remedy is wholly or partially dependent upon the statutory scheme which

On March 5, 2010, the Plaintiffs moved for reconsideration
of the February 26, 2010 order.  No. WDQ-05-1428, ECF No. 143.
That day, the Defendants moved for judgment on the pleadings and
to decertify the class.  No. WDQ-05-1428, ECF No. 144.  On May
5, 2010, the Court denied the plaintiffs' motion for reconsider-
ation and granted the defendants' motion for judgment and to
decertify the class.  No. WDQ-05-1428, ECF No. 152.  The Court
held that the Plaintiffs had failed to state a claim because
they had not exhausted administrative remedies, and "allow[ed]
the MIA to determine whether the Insurance Code has been
violated and the remedy, if any, to which the Plaintiffs are

---

also contains the administrative remedy, or upon the expertise
of the administrative agency, Maryland courts have usually held
that exhaustion is required."  *Id.* (internal quotation marks
omitted).

The Fourth Circuit held that the plaintiffs' claim for
money had and received was "dependent" on the Maryland Insurance
Code because it would succeed "only if [the] plaintiffs [could]
show that [the insurer] violated the Code" by charging higher
rates than those on file with the MIA.  *Id.*  "If the Insurance
Code did not require [the insurer] to adhere to its filed rates,
plaintiffs would have no right to recover from [it] for charging
an excessive fee."  *Id.*  Further, the plaintiffs' claim impli-
cated the Maryland Insurance Commissioner's expertise; as the
court explained, the Commissioner was in a better position than
a federal court to determine, *inter alia*, whether the insurer
had violated the Code and, if so, the proper remedy.  *Id.*  Thus,
the plaintiffs' claim had been properly dismissed.  *Id.*

*Arthur* also affirmed the dismissal of the negligent
misrepresentation claim on the ground that the complaint did not
allege a false statement.  *See Arthur*, 569 F.3d at 162 n.3.  The
*Arthur* plaintiffs did not appeal the dismissal of their civil
conspiracy claim, which the district court dismissed because
civil conspiracy is not a separate cause of action under
Maryland law.  *See Arthur v. Ticor Title Ins. Co. of Fla.*, No.
07-1737-AMD, 2008 WL 7854915, at *6-7 (D. Md. Mar. 11, 2008).

entitled." ECF No. 151 at 11. Because the Plaintiffs were not properly before the Court, the Court decertified the class. *Id.* at 12.

On May 11, 2010, acting on Mitchell Tracey and Austin's administrative complaint, the MIA determined that United General and First American violated § 27-614(b) of the Insurance Code by not providing Mitchell Tracey and Austin a reissue rate for settlements conducted on their behalf. ECF No. 3-3 at 2-3. The MIA concluded that Mitchell Tracey had been overcharged by $166.26 for the title insurance premium, and found she was entitled to a refund in that amount, plus six percent per annum interest from February 22, 2005. *Id.* at 5. The MIA similarly concluded that Austin was entitled to a refund for a $199.00 overcharge, plus interest from June 16, 2008. *Id.* at 8. The MIA did not make findings as to absent class members on whose behalf Mitchell Tracey and Austin sought relief, concluding that it did not have "sufficient information . . . to review the allegations with regard to unnamed and unspecified individuals." *Id.* at 3; Compl. ¶¶ 37, 49.

On May 19, 2010, citing the MIA's decision, the plaintiffs in *Mitchell Tracey I* moved for reconsideration of the Court's order granting judgment for the defendants and decertifying the class. No. WDQ-05-1428, ECF No. 155. On November 17, 2010, the Court denied the motion for reconsideration, concluding that the

MIA decision was not new evidence because it arose after judgment.  No. WDQ-05-1428, ECF No. 168; ECF No. 167 at 6.  The plaintiffs appealed.  No. WDQ-05-1428, ECF No. 169.  On August 2, 2011, the Fourth Circuit affirmed, concluding that, on the facts alleged, "*Arthur* mandates dismissal to allow the MI[A]to assess, in the first instance, 'whether the Insurance Code has been violated and the remedy, if any, to which the Plaintiffs are entitled.'"  No. WDQ-05-1428, ECF No. 173 at 8 (*quoting* ECF No. 151 at 11).  On August 29, 2011, United General and First American issued Mitchell Tracey and Austin refund checks covering the amount of their alleged overcharges and interest. *See* ECF No. 3-7.  According to First American, Mitchell Tracey and Austin have "refused" to cash them.  ECF No. 3-2 at 15.

   2. *Mitchell Tracey II* (This Case)

   On April 30, 2012, the Plaintiffs filed the present action against United General and First American for RICO violations and other claims.  ECF No. 1.[8]  On May 25, 2012, United General and First American moved to dismiss.  ECF No. 3.  On May 25,

---

[8] The complaint alleged six causes of action:
   (1) Money had and received (Count One);
   (2) Negligence (Count Two);
   (3) Breach of contract (Count Three);
   (4) Investment of proceeds of racketeering activity, in violation of 18 U.S.C. § 1692(a) (Count Four);
   (5) Conducting or participating in a RICO enterprise, in violation of § 1692(c) (Count Five); and
   (6) Conspiracy to violate RICO, in violation of § 1692(d) (Count Six).

2012, First American sought leave to defend the action as the sole remaining defendant. ECF No. 5. This Court granted the motion. ECF No. 27. On June 25, 2012, the Plaintiffs opposed the motion to dismiss. ECF No. 20. A reply followed. ECF No. 22.

II. Analysis

A. Legal Standards

Under Fed. R. Civ. P. 12(b)(1), the Court must dismiss an action if it discovers it lacks subject matter jurisdiction. The plaintiff has the burden of proving the Court has jurisdiction, and the Court must make all reasonable inferences in the plaintiff's favor. *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004). The Court may "look beyond the pleadings" to decide whether it has subject matter jurisdiction, but it must presume that the factual allegations in the complaint are true. *Id.*

Under Fed. R. Civ. P. 12(b)(6), an action may be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6) tests the legal sufficiency of a complaint, but does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Court bears in mind that Rule 8(a)(2) requires only a "short and plain statement of the claim showing that the pleader

is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001).  Although Rule 8's notice-pleading requirements are "not onerous," the plaintiff must allege facts that support each element of the claim advanced.  *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 764-65 (4th Cir. 2003).  These facts must be sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

This requires that the plaintiff do more than "plead[] facts that are 'merely consistent with a defendant's liability'"; the facts pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 557).  The complaint must not only allege but also "show" that the plaintiff is entitled to relief.  *Id.* at 679 (internal quotation marks omitted). "Whe[n] the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not shown--that the pleader is entitled to relief."  *Id.* (internal quotation marks and alteration omitted). An affirmative defense, such as the statute of limitations, may be raised in a motion to dismiss if clear from the face of the complaint.  *See Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996).

B. The Motion to Dismiss[9]

First American argues that the complaint should be dismis-
sed because (1) the Plaintiffs' claims are moot, depriving the
Court of subject-matter jurisdiction; (2) Mitchell Tracey's
claims are time-barred; and (3) the Plaintiffs have failed to
state a claim under Fed. R. Civ. P. 12(b)(6) and, as to their
RICO allegations, under Fed. R. Civ. P. 9(b). ECF No. 3. The
Plaintiffs counter that the restitution they received from First
American through the MIA proceeding was insufficient to moot
their claims; equitable tolling renders Mitchell Tracey's claims
timely; and each cause of action was adequately pled. *See*
*generally* ECF No. 20.

1. Mootness

First American argues that the Plaintiffs' claims are moot,
requiring dismissal for lack of subject-matter jurisdiction,
because they were already refunded the overcharges. *See* ECF No.
3-2 at 17-23. The Plaintiffs counter that anything short of an
offer of judgment is insufficient to moot a claim; the amount
tendered is less than the amount to which they would be entitled

---

[9] The motion to dismiss was filed before United General was
terminated, leaving First American as the sole defendant. *See*
ECF Nos. 5, 27. Because United General and First American
jointly moved for dismissal and presented their argument as a
unit, *see* ECF No. 3, and First American "assumed all of the
rights and liabilities of United General" when it acquired
United General's parent, ECF No. 5 at 1, the Court will treat
the companies as a unit (First American) in analyzing the
motion.

under their claims; and the tender includes nothing for the claims of the class.   ECF No. 20 at 11.

"'[T]he doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction.'"   *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (*quoting United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)).   A case is moot "'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'"   *Id.*   A case can become moot due to a change in factual circumstances or in the law.   *Id.*   "Generally speaking, one such [factual] circumstance mooting a claim arises when the claimant receives the relief he or she sought to obtain through the claim."   *Id.* (*quoting Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002)).

In support of its mootness argument, First American relies on the Fourth Circuit's ruling in *Woods v. Stewart Title Guaranty Co.*, No. 10-2104 (4th Cir. Nov. 2, 2011).   In *Woods*, the district court dismissed the case and decertified the class because Woods had not exhausted her administrative remedies with the MIA.   *Woods v. Stewart Title Guar. Co.*, No. CCB-06-0705, 2010 WL 786294, at *2-3 (D. Md. Mar. 3, 2010).   Woods then filed a complaint with the MIA, and the MIA determined that she had been overcharged.   *Woods v. Stewart Title Guar. Co.*, 2010 WL 3395655, at *2 (D. Md. Aug. 26, 2010).   Stewart tendered a check

13

for the overcharge plus interest, but Woods refused to accept
it.  The court denied Woods's Rule 60(b) motion for reconsider-
ation, because the MIA's decision was not "newly discovered
evidence" and Woods had not shown "extraordinary circumstances"
justifying relief.  *Id.*  On November 2, 2011, the Fourth Circuit
dismissed Woods's appeal of the dismissal and denial of
reconsideration[10] as "moot."  *Woods*, No. 10-2104, ECF No. 51 at 1
(4th Cir. Nov. 2, 2011).

First American argues that the Fourth Circuit in *Woods*
dismissed Woods's appeal because her claim had been fully
satisfied, rendering the Plaintiffs' claims moot for the same
reason.  *See* ECF No. 3-2 at 20.  The Plaintiffs argue that the
Fourth Circuit dismissed Woods's *appeal* as moot, not the claim
itself, and is thus inapplicable.  ECF No. 20 at 20.  The
Plaintiffs are correct.  Woods appealed dismissal on the grounds
that she was not required to administratively exhaust.  While
her appeal was pending, she exhausted administrative remedies by
filing a complaint with the MIA--mooting her appeal.  As another
district court has recognized, *Woods* accordingly "has no bearing
on the question of mootness" here.  *Carter v. Stewart Title &
Guar. Co.*, No. CCB-12-0167, 2013 WL 436517, at *3 (D. Md. Feb.
4, 2013); *Winston v. Stewart Title & Guar. Co.*, No. CCB-10-2425,
2013 WL 436455, at *3 (D. Md. Feb. 4, 2013).

---

[10] *See* No. CCB-06-0705, ECF No. 105 (notice of appeal).

This Court finds *Simmons*--not *Woods*--is instructive. In *Simmons*, the Fourth Circuit held that an offer of relief that does not include an offer of judgment is inadequate to moot a claim. 634 F.3d at 766. Here, pursuant to the MIA's decision on the Plaintiffs' administrative complaint, First American tendered to the Plaintiffs their title insurance overcharges, plus interest. ECF No. 3-2 at 20; *see also* ECF No. 3-7. First American did not offer, and has not since offered, judgment. Without this offer, the Court "would have no basis to compel [First American] to pay [the Plaintiffs] should the check[s] turn out to be defective in some way." *Carter*, 2013 WL 436517, at *4. The defectiveness concern is present here, as the Plaintiffs specifically allege that their checks are now stale. *See* ECF No. 20 at 13. Moreover, contrary to First American's assertion that the Plaintiffs have "indisputably" received full compensation, ECF No. 3-2 at 20, the Plaintiffs' claims additionally seek treble damages (as to the RICO counts), attorney's fees, and costs. Compl. at 21, 22, 24, 28, 29, 31.[11]

---

[11] *See also Warren v. Sessoms*, 676 F.3d 365, 372 (4th Cir. 2012) ("Certainly, had [the plaintiff] made a specific demand in the amended complaint for actual damages and the defendants offered that amount or more, the offer of judgment would have mooted [the] action. Similarly, had [the plaintiff] quantified her alleged damages in response to a discovery request and the defendants offered that amount, her case would be moot. But, at this stage of the proceedings, before any evidentiary hearing or judicial fact finding in the district court, we simply cannot hold that [the plaintiff] could not possibly recover more than

Because the Plaintiffs may be entitled to relief beyond the amount of the overcharge plus interest, First American has not provided the "full relief" necessary to justify dismissal on mootness grounds.  *Cf. Carter*, 2013 WL 436517, at *4-5.[12]

First American's 12(b)(1) motion to dismiss on mootness grounds will be denied.

---

[actual damages] if her case proceeded to a jury trial.");
*Mitchell-Tracey v. United Gen. Title Ins. Co.*, 839 F. Supp. 2d
821, 826 (D. Md. 2012) (noting that the plaintiffs could file
suit for punitive damages, even though compensatory damages
might be unavailable because already obtained through the
administrative process).

[12] Even if full relief had been provided to the Plaintiffs, the
case still would not be moot because no relief has been tendered
for the class claims.  *See, e.g.*, *Pitts v. Terrible Herbst,
Inc.*, 653 F.3d 1081, 1092 (9th Cir. 2011) ("Only once the denial
of class certification is final does the defendant's offer--if
still available--moot the merits of the case because the
plaintiff has been offered all that he can possibly recover
through litigation."); *Lucero v. Bureau of Collection Recovery,
Inc.*, 639 F.3d 1239, 1249 (10th Cir. 2011) ("[A] nascent
interest attaches to the proposed class upon the filing of a
class complaint such that a rejected offer of judgment for
statutory damages and costs made to a named plaintiff does not
render the case moot under Article III."); *Sandoz v. Cingular
Wireless LLC*, 553 F.3d 913, 920-21 (5th Cir. 2008) (timely filed
motion for class certification relates back to the filing of the
complaint so that a precertification offer of judgment does not
moot the case); *Kensington Physical Therapy, Inc. v. Jackson
Therapy Partners, LLC*, 880 F. Supp. 2d 689, 694 (D. Md. 2012)
(finding "persuasive" holdings of courts employing the relation
back doctrine to allow class action claims to go forward *when no
certification motion is pending* and the plaintiff has received
an offer of complete relief).  This Court has not denied
certification in the present case; indeed, a motion to certify
has yet to be filed.

2. Statutes of Limitations

First American next argues that Mitchell Tracey's claims are time-barred.  ECF No. 3-2 at 23.  The Plaintiffs contend the class action tolling doctrine applies, rendering Mitchell Tracey's claims timely.  ECF No. 20 at 22-23.

In Maryland, a civil action must be filed within three years from the date it accrues.  Md. Code Ann., Cts. & Jud. Proc. § 5-101.  A four-year statute of limitations applies to civil RICO claims.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143 (156).[13]  The present case was filed on April 30, 2012--about eight years after First American allegedly overcharged Mitchell Tracey for title insurance.  *See* Compl. ¶¶ 29-35.  Thus, on the face of the complaint, Mitchell Tracey's claims are time-barred unless the statutes of limitations have been tolled.

Federal tolling law governs the viability of Mitchell Tracey's civil RICO claims.  Maryland law governs the rest.[14]  Both parties rely on the federal class action tolling doctrine,

---

[13] "The statutory period [for a RICO claim] begins to run when a plaintiff knows or should know of the injury that underlies his cause of action." *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 220 (4th Cir.1987).

[14] *Cf. Wade v. Danek Med., Inc.*, 182 F.3d 281, 289 (4th Cir. 1999) ("[I]n any case in which a state statute of limitations applies--whether because it is "borrowed" in a federal question action or because it applies under *Erie* in a diversity action-- the state's accompanying rule regarding equitable tolling should also apply."); *see also id.* at 289 (collecting cases).

as set forth in *American Pipe & Construction Co. v. Utah*, 414
U.S. 538 (1974), to support their respective timeliness
arguments.   The Plaintiffs argue that the statutes of limitat-
ions were tolled while *Mitchell Tracey I* was pending.   ECF No.
20 at 22.   First American argues that *Mitchell Tracey I* did not
toll the limitations periods, because the case was dismissed
without prejudice.   ECF No. 3-2 at 23-24.   As discussed above,
*American Pipe* is a federal tolling doctrine and thus does not
automatically apply to the Plaintiffs' Maryland claims.
However, the Maryland Court of Appeals has adopted *American Pipe*
and its progeny,[15] and the Court will therefore discuss the
doctrine's applicability to all pending claims.

Under *American Pipe*, "the commencement of a class action
suspends the applicable statute of limitations as to all
asserted members of the class who would have been parties had
the suit been permitted to continue as a class action."   414
U.S. at 554.   "Once the statute of limitations has been tolled,
it remains tolled for all members of the putative class *until
class certification is denied*," at which point "class members
may choose to file their own suits or to intervene as plaintiffs
in the pending action."   *Crown, Cork & Seal Co. v. Parker*, 462
U.S. 345, 354 (1983) (emphasis added).   The *Crown, Cork & Seal*

---

[15] *Philip Morris USA, Inc. v. Christensen*, 905 A.2d 340, 355 (Md.
2006).

18

Court thereby "untethered this tolling rule from any necessary connection to the reasons for denying certification." *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003). "The rule should not be read, however, as leaving a plaintiff free to raise different or peripheral claims following denial of class status." *Crown, Cork & Seal*, 462 U.S. at 354 (Powell, J., concurring).

Here, the statutes of limitations began to run, at the earliest, when Mitchell Tracey refinanced her home on March 1, 2005. Compl. ¶ 29-32. The periods were tolled when *Mitchell Tracey I* was filed (on April 14, 2005), and remained tolled until, at the earliest, May 5, 2010: when the Court granted the defendants' motion to decertify. No. WDQ-05-1428, ECF No. 152. Mitchell Tracey filed the instant suit on April 12, 2012. Compl.[16] At that point, 754 days--slightly more than two years--

---

[16] This Court notes--although the parties have not--that the present action asserts different claims than those asserted in *Mitchell Tracey I*. Specifically, whereas *Mitchell Tracey I* asserted claims for violations of RESPA, money had and received, negligent misrepresentation, and civil conspiracy, this action asserts claims for violations of RICO, money had and received, negligence, and breach of contract. *Compare* No. WDQ-05-1428, ECF No. 2, *with* Compl. Despite these variations in form, the respective complaints' factual allegations are practically identical. Both complaints define the class as "a class of Maryland consumers whose property had, within the previous 10-years, a validly issued title insurance policy—entitling them to a 40% discount off of the premium for newly issued title insurance policies by United General and/or First American—but who did not receive any such discount off of the premium for title insurance." *Compare* No. WDQ-05-1428, ECF No. 2 ¶ 4, *with*

had run on the statutes of limitations.[17]   Thus, the action was

timely.[18]

      First American is not entitled to dismissal on timeliness

grounds.[19]

      3. Failure to State a Claim

      First American argues that the Plaintiffs have failed to

state a claim upon which relief can be granted.   ECF No. 3-2 at

---

Compl. ¶ 4.   First American itself recognizes the actions'
similarities, characterizing the instant complaint as having
"recycl[ed]" that in *Mitchell Tracey I*.   ECF No. 3-2 at 11.
First American was "fairly placed on notice" of the claims now
pending, and thus will not suffer prejudice by application of
the tolling doctrine to them.   *Cf. Crown, Cork & Seal*, 462 U.S.
at 355 (Powell, J., concurring).

[17] Forty-five days passed between March 1, 2005 (refinancing) and
April 14, 2005 (filing of *Mitchell Tracey I*); an additional 709
days passed between May 5, 2010 (decertification) and April 14,
2012 (filing of this case).

[18] First American asserts that "[s]ince *Mitchell Tracey I* was
properly dismissed without prejudice, it did *not* toll any
statute of limitations."   ECF No. 3-2 at 23-24.   First American
cites several cases for this proposition, but none is
controlling or even involved the *American Pipe* class action
tolling rule.   *Id.* at 24 (*citing, e.g., Quinn v. Watson*, 119 F.
App'x 517, 518 n.* (4th Cir. 2005) (per curiam) ("A Title VII
action must be brought within 90 days of receipt of a right-to-
sue letter issued by the Equal Employment Opportunity
Commission.   In instances where a complaint is timely filed and
later dismissed, the timely filing of the complaint does not
"toll" or suspend the ninety-day limitations period.") (internal
citation omitted))).   First American has not cited, and this
Court is not aware of, any binding decision applying the above
limiting principle in the *American Pipe* context.

[19] This Court need not address whether the Plaintiffs' claims are
timely under other equitable tolling principles.   *See* ECF No. 3-
2 at 25-26.

26.   The Plaintiffs counter that all claims were adequately alleged.   ECF No. 20 at 24, 55, 57.

     a. RICO Claims

RICO "does not cover all instances of wrongdoing.   Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity."   *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312 (4th Cir. 2010) (internal quotation marks omitted).   Thus, although courts read the terms of the statute "liberally" to "effectuate its remedial purposes," they must also "exercise caution" to ensure that "RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted." *Id.* (internal quotation marks omitted).   To state a civil RICO claim, a plaintiff must allege that the defendants engaged in, or conspired to engage in, a pattern of "racketeering activity." 18 U.S.C. § 1962(a), (c) (emphasis added).   "Racketeering activity" includes mail fraud under 18 U.S.C. § 1341, wire fraud under 18 U.S.C. § 1343, and transporting money converted or fraudulently obtained interstate under 18 U.S.C. § 2314.   *See* 18 U.S.C. § 1961(1) (defining racketeering activity).

Counts Four through Six allege violations of RICO subsections (a),[20] (c),[21] and (d)[22].  18 U.S.C. § 1962(a), (c), and (d).  First American argues that the Plaintiffs have failed to plead allegations in support of the elements of "an

---

[20] Section 1962(a) provides, in relevant part, that
> [i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

To state a claim under § 1962(a), the Plaintiffs must allege that First American (the "person") (1) received income directly or indirectly from a pattern of racketeering activity, and (2) used or invested, directly or indirectly, any part of that income in the operation of an enterprise engaged in or affecting interstate commerce.  *United States v. Vogt*, 910 F.2d 1184, 1194 (4th Cir. 1990).

[21] Under § 1962(c),
> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To state a claim under § 1962(c), the Plaintiffs must allege First American's (the "person"): (1) conduct or participation in (2) an enterprise (3) through a pattern (4) of racketeering activity.  18 U.S.C. § 1962(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

[22] Section 1962(d) prohibits conspiring to violate the foregoing subsections.  To allege a subsection (d) claim, the Plaintiffs must allege that "each defendant agreed that another coconspirator would commit two or more acts of racketeering." *United States v. Pryba*, 900 F.2d 748, 760 (4th Cir. 1990).

22

enterprise" and "racketeering activity," which are "necessary elements common to all three subsection claims." *Proctor v. Metropolitan Money Store Corp.* 645 F. Supp. 2d 464, (D. Md. 2009); ECF No. 3-2 at 27-29. First American also argues that the Plaintiffs' conspiracy claim is barred by the "intra-corporate conspiracy" doctrine. ECF No. 3-2 at 29-31. Because several of First American's arguments are common to all RICO counts, the Court will address them in turn.

> i. § 1962(c)'s "Distinctiveness" Requirement and the Association-in-Fact Enterprise

RICO defines an "enterprise" as "any individual, partner-ship, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit; and (3) the enterprise is an entity "separate and apart from the pattern of activity in which it engages." *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477-78 (D. Md. 2009). "[A]n associated-in-fact enterprise is one type of enterprise defined in § 1961(4)." *United States v. Tillett*, 763 F.2d 628, 631 n.2 (4th Cir. 1985). To satisfy § 1962(c)'s "distinctiveness" requirement, the Plaintiffs must further allege that the RICO "enterprise" is distinct from the defendant "person" alleged to

have violated RICO.   *Levine v. First Am. Title Ins. Co.,* 682 F.

Supp. 2d 442, 457 (E.D. Pa. 2010); *Toucheque v. Price Bros. Co.,*

5 F. Supp. 2d 341, 346–47 (D. Md. 1998).[23]

First American first challenges the Plaintiffs' allegations

of distinctiveness, arguing that "despite RICO's settled

'separateness' . . . requirement, Plaintiffs plead a RICO

enterprise consisting solely of Defendants and their agents."

ECF No. 3-2 at 28.   Specifically, "[b]y averring that Defendants

acted *through their title agents*, Plaintiffs simply identify a

'person' and 'enterprise' that are one and the same."   *Id.* at 29

(emphasis added).   "[T]o establish liability under 1962(c) one

must allege and prove the existence of two distinct entities:

(1) a 'person'; and (2) an 'enterprise' that is not simply the

same 'person' referred to by a different name."   *Cedric Kushner*

*Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).[24]   The

complaint alleges that First American is the liable person and

the "enterprise" is an association-in-fact between First

---

[23] Critically, the "distinctiveness" requirement is limited to §
1962(c) claims; § 1962(a) does not carry this requirement.
*Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990)
("[F]or a violation of § 1962(a), the offender and the
enterprise need not be separate. They may be identical.").

[24] *Chen v. Mayflower Transit, Inc.*, 159 F. Supp. 2d 1103, 1109
(N.D. Ill. 2001) (explaining that, when "a corporation deals
with its agents in the ordinary way so that the agents' role in
the corporation's [allegedly] illegal acts is *entirely*
*incidental*," there is no separate and distinct enterprise
(emphasis added)).

American and its title agents in Maryland.   Compl. ¶¶ 64-65.

The complaint describes the enterprise:

> [First American and United General] are the principals
> in   their   respective   enterprises   and   have   the
> responsibility for providing title insurance policies.
> [They] have agent selection processes to select agents
> to issue United General and First American policies.
> The title agents act as United General's and First
> American's agents in selling title insurance policies
> and often act as closing agents for the lenders in the
> same mortgage transactions.   The title agents, acting
> on [First American and United General's] behalf and
> subject to [the companies'] control, are responsible
> for   conducting   the   title   searches   and   .   .   .
> calculating the title insurance premiums.

The title agents are not First American employees; instead,

they are "non-exclusive agents who work with different title

insurance companies."   Compl. ¶ 65.   Because First American and

the title agents are an "enterprise" separate and distinct from

the Defendant First American, the Plaintiffs have sufficiently

alleged a "person" distinct from the "enterprise."[25]

First American also challenges the sufficiency of the

Plaintiffs' allegations as to an "association-in-fact."   As

stated above, to plead a RICO enterprise, the Plaintiffs must

show: (1) an ongoing organization, (2) the various associates of

---

[25] *Levine*, 682 F. Supp. 2d at 459-60; *Hanrahan v. Britt*, No. 94-
4615, 1995 WL 422840, at *7 (E.D. Pa. July 11, 1995) (Defendant
Amway "distinct" from the alleged association-in-fact enterprise
of Amway and its network of Amway distributors); *see also Living
Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361
(9th Cir. 2005); *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277,
1284 (11th Cir. 2006); *In re: Countrywide Fin. Corp. Mortg.
Marketing & Sales Practices Litig.*, 601 F. Supp. 2d 1201, 1212-
13 (S.D. Cal. 2009).

which function as a continuing unit, and (3) the organization
has an existence separate and apart from the alleged pattern of
racketeering activity.   *United States v. Turkette*, 452 U.S. 576,
583 (1981).   According to First American, the Plaintiffs' RICO
claims lack the first two elements because they "fail[] to
identify any common purpose or ongoing relationship among the
various title agents," and lack the third element because they
"fail[] to identify a RICO enterprise that is separate from the
alleged racketeering conduct.   ECF No. 3-2 at 31, 33.   On the
third element, First American argues that the Plaintiffs
"describe nothing more than a business relationship between
[First American] and [its] title agents."   *Id.*

To be organized, an association-in-fact enterprise "need
not have a hierarchical structure or a chain of command;
decisions may be made on an ad hoc basis and by any number of
methods."   *Boyle v. United States*, 556 U.S. 938, 948 (2009).[26]
But, "[v]ague allegations of a RICO enterprise . . . lacking any
distinct existence and structure" will not survive dismissal.
*VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 700 (6th
Cir. 2000), *abrogated on other grounds by Bridge v. Phoenix Bond
& Indem. Co.*, 553 U.S. 639 (2008).   Here, the Plaintiffs have

---

[26] *See id.* at 947 n.4 (explaining that, if "several individuals,
*independently and without coordination*, engaged in a pattern of
crimes listed as RICO predicates," proof of these patterns
"would not be enough to show that the individuals were members
of an enterprise") (emphasis added)).

sufficiently alleged that there is a hierarchically structured organization, that is, First American's contractual relationship with its title agents, in which First American is the principal whom the title agents assist by selling insurance policies, acting as closing agents, conducting title searches, and calculating the title insurance premiums.  Compl. ¶¶ 66. Allegedly, First American used this association-in-fact to overcharge for title insurance and to mislead the Plaintiffs into believing that it had not.  *Id.* ¶¶ 115-118.  Indeed, the association's common purpose was "to charge borrowers inflated and illegal fees, to defraud members of the public and to give effect to the scheme described," by a distinct division of labor.  *Id.* ¶ 116.  Thus, the Plaintiffs have pled the first two *Turkette* elements (an ongoing organization, the various associates of which function as a continuing unit).

To plead *Turkette*'s third element (organization has an existence "separate and apart" from the alleged pattern of racketeering activity), a plaintiff must allege that the enterprise is "more than" an association of individuals conducting the corporation's normal business functions.  *R.R. Brittingham v. Mobil Corp.*, 943 F.2d 297, 301 (3d Cir. 1991). Contrary to First American's belief, the Plaintiffs have alleged more than the performance of ordinary business functions here. Instead, the Plaintiffs allege that First American and its title

27

agents deliberately overcharged and misappropriated amounts due for the purchase of title insurance, in violation of Maryland law. *E.g.*, Compl. ¶¶ 15, 15, 32-34, 43-46. Such unlawful acts are not conducted in the ordinary course of business. *Cf. Levine*, 682 F. Supp. 2d at 461 ("The fact that the organization between Defendant and its title agents engages in legitimate functions of performing title searches, selling and providing title insurance, and investigating and paying claims does not overcome the claim of illicit overcharging which is not part of the normal affairs of the business relationship."). Thus, the Plaintiffs have also alleged a pattern of racketeering by First American and its agents that existed apart from a normal business relationship and is distinct from the enterprise.

ii. Racketeering Activity

The Plaintiffs have alleged three predicate acts of "racketeering activity": mail fraud, wire fraud, and interstate transport of money converted or fraudulently obtained. *E.g.*, Compl. ¶ 68. The elements of mail fraud are: "(1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme." *Pereira v. United States*, 347 U.S. 1, 8 (1954); *see also Biggs v. Eaglewood Mortg., LLC*, 353 F. App'x 864, 866 (4th Cir. 2009) ("Mail fraud occurs when an individual, having devised a plot to defraud, uses the mail in order to further their plot."). "The elements of wire fraud are similar;

28

applying to the use of electronic or telephonic communication."
*Foster v. Wintergreen Real Estate Co.*, 363 F. App'x 269, 273 n.5
(4th Cir. 2010).  To state a claim for interstate transport of
money converted or fraudulently obtained, a plaintiff must, at a
minimum, allege how or when these interstate transports
occurred.  *See Kerby v. Mortg. Funding Corp.*, 992 F. Supp. 787,
798 n.3 (D. Md. 1998) (disregarding an alleged predicate act
based on nothing more than a "bare allegation" of a violation).

When mail and wire fraud are asserted as predicate acts in
a civil RICO claim, each must be pled with particularity.  *See*
Fed. R. Civ. P. 9(b).  Specifically, the complaint must allege
the "time, place, and contents of the false representations, as
well as the identity of the person making the misrepresentation
and what he obtained thereby."  *Harrison v. Westinghouse*
*Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  However,
"[a] court should hesitate to dismiss a complaint under Rule
9(b) if the court is satisfied (1) that the defendant has been
made aware of the particular circumstances for which he will
have to prepare a defense at trial, and (2) that plaintiff has
substantial prediscovery evidence of those facts."  *Scott v. WFS*
*Fin., Inc.*, No. 2:06cv349, 2007 WL 190237, at *5 (E.D. Va. Jan.
18, 2007) (internal quotation marks omitted).

First American argues that the Plaintiffs have failed to
sufficiently plead mail and wire fraud, because they have not

"identif[ied] the circumstances surrounding any false
representations, including the time, place, content, and
speaker." ECF No. 3-2 at 34. The Court does not agree. "A
scheme to defraud means any deliberate plan of action or course
of conduct by which someone intends to deceive or cheat another
or by which someone intends to deprive another of something of
value." *Levine*, 682 F. Supp. 2d at 462.[27] Here, the Plaintiffs
allege that First American's title agents made the initial
contact with the consumer, and each time, they "falsely and
intentionally misrepresented to their customers that they would
pay only the filed or best rate for title insurance." Compl. ¶
118. The Plaintiffs' HUD-1 Settlement Statements, indicating
the unlawfully high premium, were part of the scheme. *Cf.*
*Levine*, 682 F. Supp. 2d at 463.[28] The Plaintiffs further allege
that First American and its title agents acted with the intent
to defraud: specifically, to overcharge borrowers for title
insurance, "guarantee[ing] a stream of business" for First
American. *Id.* ¶¶ 62, 67. As reward for the title agents'

---

[27] *See also United States v. Townley*, 665 F.2d 579, 585 (5th Cir.
1982) ("The statements need not be false or fraudulent on their
face, and the accused need not misrepresent any fact, since all
that is necessary is that the scheme be reasonably calculated to
deceive persons of ordinary prudence and comprehension . . . ."
(internal quotation marks omitted)).

[28] *See also, e.g., Kehr Packages, Inc. v. Fidelcor, Inc.*, 926
F.2d 1406, 1416 n.3 (3d Cir.1991) (mail fraud can be predicated
on mailings "designed to lull the victims into a false sense of
security" (internal quotation marks omitted)).

assistance, First American "reward[ed]" the agents with "illegal payments and kickbacks." *Id.* ¶ 67.  The Plaintiffs have shown a scheme to defraud.

The Plaintiffs have also shown use of the mails and electronic communications to further the above scheme.  "To be part of the execution of the fraud . . . the use of the mails need not be an essential element of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710 (1989).  Instead, they need only be "incident to the essential part of the scheme." *Pereira v. United States*, 347 U.S. 1, 8 (1954).  According to the complaint, First American "used the United States mails and telephone wires" to submit annual reports to the MIA; the MIA, in turn, relied on the documentation to permit First American to continue conducting business. *Id.* ¶ 69.  The complaint also alleges specific dates when First American used the mail and electronic communication to further its scheme vis-à-vis Mitchell Tracey and Austin. *See, e.g., id.* ¶¶ 77-78. Distributions of the profits were sent interstate. *Id.* ¶ 76. More than two such predicate acts have occurred in the past 10 years, as required by § 1961(5).

The Plaintiffs have alleged, with particularity, that First American had a scheme to defraud and used the mail and electronic communication to further that scheme.  The Plaintiffs have

further alleged that First American transported money obtained through fraud interstate.

        iii.  Intracorporate Conspiracy Doctrine

Under the intracorporate conspiracy doctrine, "a conspiracy between a corporation and its agents, acting within the scope of employment, is a legal impossibility." *Marmott v. Md. Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986).  The Fourth Circuit has identified two exceptions to the intracorporate conspiracy doctrine: "(1) when a corporate officer has an 'independent personal stake' in achieving the illegal objectives of the corporation, and (2) when the agent's acts are unauthorized." *Walters v. McMahen*, 795 F. Supp. 2d 350, 358 (D. Md. 2011) (internal citations and quotation marks omitted).  First American argues that the intracorporate conspiracy doctrine renders the Plaintiffs' § 1692(d) claim "legally infirm."  ECF No. 3-2 at 29-30.[29]  The Plaintiffs object that the doctrine does not apply to § 1962(d) claims and, even if it did, it does not bar the Plaintiffs' claim because the independent title agents "were not acting solely as First American's agents in the course

---

[29] First American also argues that, assuming the Plaintiffs could bring this cause of action, they do not allege any agreement to violate RICO.  ECF No. 3-2 at 30.  This argument can be dismissed summarily, as the complaint plainly alleges that First American and its title agents agreed to issue overcharges on title insurance, from which both First American and its title agents would financially benefit.

of their actions in furtherance of the RICO enterprise." ECF
No. 20 at 51.

The Court will assume, for purposes of this analysis, that
the intracorporate conspiracy doctrine applies to claims under §
1962(d). *See Walters*, 795 F.Supp.2d at 358 (noting that the
Fourth Circuit "has yet to rule directly on this issue," but
applying the doctrine to a RICO claim). The Plaintiffs have
sufficiently pled the "independent personal stake" exception to
the doctrine. For that exception to apply, a conspirator must
possess a personal interest independent and "wholly separable"
from the interests of the corporation. *Selman v. Am. Sports
Underwriters, Inc.*, 697 F. Supp. 225, 239 (W.D. Va. 1988). The
exception is triggered when the alleged conspirator will
"receive greater compensation from [his or her] alleged
activities." *Walters*, 795 F. Supp. 2d at 359 n.16. Here, the
Plaintiffs have alleged that the agents profited from the
unlawful overcharges, receiving up to 75% of the premium
collected. Compl. ¶¶ 19, 66. The intracorporate conspiracy
doctrine does not preclude relief.

Thus, the Plaintiffs have adequately alleged violations of
RICO under § 1962(a), (c), and (d).

b. State Law Claims (Counts One, Two, Three)

i. Money had and received (Count One)

"An action for money had and received is one of what have been referred to as the 'common counts' or 'common money counts' that developed under English common law as a branch of the common law writ of assumpsit--*indebitatus assumpsit*." *Bourgeois v. Live Nation Entm't, Inc.*, 59 A.3d 509, 527 (Md. 2013). "An action for money had and received is a well-established remedy with a long history in [Maryland]." *Id.* "Maryland cases have found [the cause of action] available to recover money obtained by fraud or false pretenses, paid upon an unexecuted illegal contract, or, in certain circumstances, paid under an executed illegal contract." *Id.* at 529. The Maryland Court of Appeals has qualified the doctrine stating that the action will lie to recover money paid in excess of that allowed by statute only if "the agreement pursuant to which it was paid has not been fully consummated, *i.e.*, remains executory. Except with respect to a usurious contract, however, the action does not lie to recover money paid under a fully consummated contract as to which the parties may be regarded as being *in pari delicto*." *Id.* at 530.

First American makes no arguments for dismissal of the money had and received claim. *See generally* ECF No. 3-2. Moreover, neither party has addressed the effect of *Bourgeois*--which issued in January 2013--on the viability of the claim.

34

Thus, to the extent that First American moves to dismiss the money had and received claim, the motion will be denied.

    ii. Negligence (Count Two)

  "For a plaintiff to state a prima facie claim in negligence, he or she must allege facts demonstrating (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Remsburg v. Montgomery*, 831 A.2d 18, 26 (Md. 2003) (internal quotation marks omitted).  "The mere negligent breach of a contract . . . is not enough to sustain an action sounding in tort." *Jacques v. First Nat'l Bank of Md.*, 515 A.2d 756, 759 (Md. 1986).  However, Maryland has "approved a few narrow exceptions to this general rule." *Lawyers Title Ins. Corp. v. Rex Title Corp.*, 282 F.3d 292 (4th Cir. 2002).  First, a negligence claim may arise from a contractual relationship in circumstances involving a vulnerable party. *See Jacques*, 515 A.2d at 762.  Second, a negligence claim may survive when the defendant owed a duty or obligation imposed by law independent of that arising out of the contract itself. *See id.* at 759.

  First American argues that the Plaintiffs' negligence claim "must be dismissed" because it "arises directly from an alleged contractual obligation that Defendants issue title polices to

their lenders." ECF No. 3-2 at 40. The Plaintiffs counter that the complaint alleges an "independent duty" under § 27-216 of the Insurance Code, which provides that a person "may not willfully collect a premium or charge for insurance" that exceeds the premium or charge applicable to that insurance under the applicable classifications and rates as filed with and approved by the Commissioner. ECF No. 20 at 58-59.

> In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent.

*Jacques*, 515 A.2d at 759-60. Here, First American's alleged failure to exercise due care creates a risk of economic loss only. However, there is an "intimate nexus" between the parties: namely, contractual privity.

The motion to dismiss the Plaintiffs' negligence claim will be denied.

### iii. Breach of contract (Count Three)

"An implied contract is an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men." *Cnty. Comm'rs of Caroline Cnty. v. J.*

*Roland Dashiell & Sons, Inc.*, 747 A.2d 600 (2000).  First

American argues that the Plaintiffs have failed to state a claim

for breach of contract because the complaint "does not explain

how they reached a meeting of the minds with [First American]

regarding any essential contract terms."  ECF No. 3-2 at 37.

The Plaintiffs object that the "meeting of the minds" is

demonstrated by the fact that they paid for title insurance and

First American provided it.  ECF No. 20 at 55 n.15; *see* Compl ¶

98.  An implied by fact contract can be inferred from the

parties' conduct.  *J. Roland Dashiell & Sons*, 747 A.2d at 606

n.6.  Here, the Plaintiffs have adequately alleged a contract,

which was breached when First American charged them more than

was lawful.  Compl. ¶ 100.

First American's motion to dismiss the breach of contract

claim will be denied.

III. Conclusion

For the reasons stated above, First American's motion to

dismiss will be denied.

\_\_\_\_3/28/13_____                    _____

Date                                                William D. Quarles, Jr.
                                                    United States District Judge

37